1
2
3
4
5
6
7

**FILED**

**DEC 15 2015**

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

8
9
10

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 11  HUNG N. DO, | No. C 14-3549 LHK (PR) |
| 12  Petitioner, | ORDER DENYING PETITION FOR |
| | WRIT OF HABEAS CORPUS; |
| 13  v. | DENYING CERTIFICATE OF |
| | APPEALABILITY |
| 14  MATHEW CATES, Warden, | |
| 15  Respondent. | |

16

17     Petitioner, a state prisoner proceeding *pro se*, filed a petition for writ of habeas corpus

18  pursuant to 28 U.S.C. § 2254. Respondent was ordered to show cause why the petition should

19  not be granted. Respondent has filed an answer, and petitioner has filed a traverse. Having

20  reviewed the briefs and the underlying record, the court concludes that petitioner is not entitled

21  to relief, and DENIES the petition.

**PROCEDURAL HISTORY**

22

23     On June 6, 2008, petitioner was charged with two counts of murder. The information

24  also alleged personal use of a deadly weapon, and a multiple murder special circumstance. On

25  May 11, 2011, after an 11-day jury trial, the jury found petitioner guilty of both counts, and

26  found true the special allegations. On July 11, 2011, the trial court sentenced petitioner to a term

27  of life without the possibility of parole, plus two years.

28     On May 21, 2013, the California Court of Appeal affirmed. On August 14, 2013, the

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
P:\PRO-SE\LHK\HC.14\Do549denhc.wpd

1 | California Supreme Court denied review.

2 | Petitioner filed the underlying federal habeas petition on August 6, 2014.

3 | **BACKGROUND**

4 | The following facts are taken from the Court of Appeal's opinion in *People v. Do*, No.

5 | H037180, 2013 WL 2263986 (Cal. App. May 21, 2013).

6 | In May 1991, a witness discovered the bodies of Cathy and her son,
Michael Bui, on the living room floor of her apartment. Police arrested no
7 | suspects for about 16 years, until 2007, after a computerized search of the
CODIS [FN1] database showed that a blood sample from the crime scene
8 | contained defendant's DNA. Defendant was arrested and charged with murder
in December 2007.

9 |
10 | FN1. CODIS (Combined DNA Index System) is a nationwide database
connecting federal, state, and local DNA databanks.

11 | At the time of her death, Cathy was a 25-year-old mother of three young
children. Her youngest son, Michael Bui, was born in 1988, two or three years
12 | before the killing. The record contains no precise evidence of who fathered
Michael, but Jason Nguyen, Cathy's ex-husband, fathered her other two
13 | children.

14 | *I. Defendant's Relationship to the Victims and Witnesses*

15 | Defendant Hung Ngoc Do was born in 1958, and emigrated from
Vietnam to the United States in 1981. At the time of the killings, he was 33
16 | years old and was working as a machinist. He knew Cathy through his
friendship with Cathy's ex-husband Jason Nguyen ("Jason").
17 |
18 | Defendant met Jason and Cathy around 1981, when they lived in the
same apartment complex. Jason, a witness for the prosecution, testified that
defendant was his "best friend," and Jason considered him family. Defendant
19 | spent much time with Jason, Cathy, and Jason's brothers. They went to each
others' homes, and to cafés and clubs where they danced and partied together.
20 | Defendant sometimes danced with Cathy.

21 | Jason testified that he never observed any evidence of a romantic
relationship between Cathy and defendant. Jason's sister also saw no evidence
22 | of a romantic relationship between Cathy and the defendant. The detective who
originally investigated the crime testified that he had interviewed more than
23 | two-dozen witnesses, none of whom said defendant had any romantic interest in
Cathy.
24 |
25 | *II. Defendant's Marriage to and Separation from Ngoc Nu Nguyen*

26 | In 1988, defendant married Ngoc Nu Nguyen ("Ngoc"). Around 1990
or 1991, they tried to start a family by engaging in frequent intercourse, but she
required medical help. Ngoc testified that she wanted to have a child because
27 | she thought it would stabilize their marriage. After several months of effort, she
became pregnant. Their daughter was born in May 1992. Ngoc testified that
28 | she did not notice any change in defendant's behavior around May 1991, and

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
P:\PRO-SE\LHK\HC.14\Do549denhc.wpd          2

1    she did not suspect him of infidelity. She also bore a son by defendant in 1994.

2        Ngoc, testifying for the defense, stated that she filed for legal separation
     in 1992, but she continued to live with defendant until 1994. In 1993, she
3    called the police after an argument with defendant in which he tried to take their
     daughter from her. Ngoc testified that defendant did not strike her.

4

5        In 1999, they physically separated. She again called police in 2000
     when defendant came to her mobile home and tried to take their son to a family
     party. She testified that defendant did not strike her, but that he tried to grab the
6    phone away from her, and it hit her on the face. She told the police that he hit
     her and injured her face, but she testified that it "just like hurt a little bit" and
7    there was no evidence of injury when the police arrived.

8        On cross-examination, she testified that she had smelled alcohol on
     defendant and she told the police he had been drinking. The prosecutor pressed
9    her on whether defendant hit her and threatened her:

10   "[Question:] Isn't it, in fact, true that on the day this happened, that's not all he
     did? He hit you in the face, he hit you in the head, he took the phone away, he
11   pulled the phone out of its socket in the wall, he went and pulled another phone
     out of the socket in the wall, and then he told you that if you call the police, he
12   would come back and kill you?

13   "[Answer:] I don't remember that.

14   "[Question:] That's what you told the police.

15   "[Answer:] This may be. At that time, I really don't want him to get into my
     house anymore."

16

17       Ngoc also admitted that in 1991 and 1992 defendant disappeared for
     days or weeks at a time, and she did not know where he was.

18       Defendant denied that he struck his wife in 1993. On
     cross-examination, he admitted pleading guilty to willfully inflicting a corporal
19   injury resulting in a traumatic condition. He testified that he pleaded guilty
     because he was asked to plead guilty. The prosecutor, questioning defendant
20   about his conviction in 2000, accused him of lying to the police to get out of
     trouble. Defendant testified that he told police he did not beat his wife, but he
21   admitted pleading guilty to battery. Again, defendant testified that he pleaded
     guilty because he was asked to plead guilty. When asked whether he told police
22   he had threatened to kill his wife, defendant testified that he could not recall
     because he "drank a little bit of beer." He denied that he slapped his wife or
23   struck her on top of the head.

24   *III. Defendant's Visit to Cathy's Apartment in 1991*

25       Defendant denied having any involvement with the killings. He testified
     that he once visited Cathy's apartment for about an hour in 1991. Cathy had
26   invited him because they were friends. She gave him a glass of water and a
     sandwich. He testified that he suffered a bloody nose during the visit, and it
27   "seems like" he washed his hands in the bathroom sink and wiped his hands
     with a towel. He could not recall whether he touched any doorknobs, and he
28   did not know how his blood got on other locations in the apartment.

1    Jason testified that he, his brother, and defendant had visited Cathy's
2    apartment prior to her death to visit his children and Cathy's youngest child.
     Jason did not see defendant suffer any injury or bloody nose, and he further
3    testified that defendant stayed around the living room for the entire visit. Jason
     saw no evidence that either Cathy or the defendant were angry with the other.

4    *IV. Crime Scene Evidence*

5    Police testified that the bodies of both Cathy and Michael were lying
     face down and bloody. Both died from multiple stab wounds, but the record
6    contains no evidence of who died first. A large pool of blood had collected
     under Cathy's body, and the police found large bloodstains in various locations
7    in the living room around the bodies. Crime scene investigators also collected
     blood samples from numerous locations throughout the apartment, including the
8    kitchen, the bedrooms and a hallway bathroom.

9    Dr. Joseph O'Hara, a forensic pathologist, testified for the prosecution
     based on a written report by the coroner who examined the bodies. The coroner
10   identified 22 stab wounds and 13 incised wounds on Cathy's body. [FN2.] The
     coroner located two stab wounds on the face, two on the front of the neck, five
11   on the back of the neck, twelve on the back, and one on the chest. Of the
     wounds the coroner measured, he estimated a depth of three inches. The
12   coroner examined some of the wounds to determine what kind of blade had
     been used. For a majority of these wounds, he determined they had been made
13   with a single-edged blade. However, O'Hara testified that he could not tell
     whether the wounds were inflicted by a kitchen knife or a hunting knife.

14
          FN2. An incised wound is a superficial, sharp-force injury to the skin
15        that is longer than it is deep. A stab wound is deeper than it is wide,
          consistent with a knife plunged straight into the skin.
16
          O'Hara testified that not all of the stab wounds were immediately lethal.
17   Several were nonlethal, such that Cathy would have survived if she had
     received medical treatment and did not die from infection. However, both of
18   her carotid arteries and jugular veins had been severed, and her lungs had been
     punctured. O'Hara testified that the carotids are high-pressure arteries, and that
19   a lot of blood would have flowed out of Cathy's body. He estimated that Cathy
     would have died in no more than one or two minutes, but she would have been
20   able to fight back through the infliction of most of the wounds. The record
     contains no evidence of the order in which the stab wounds were inflicted.
21
          The coroner located numerous incised wounds consistent with the use of
22   a knife, including wounds on her upper thigh and lower legs, her abdomen, her
     left hand, and her groin. O'Hara testified that he could not tell whether the
23   wounds were created with a single-edged blade, a double-edged knife, or a
     serrated knife. The coroner also identified several "blunt force" injuries, a
24   category that generally includes abrasions, contusions, and lacerations. She had
     numerous scratches or lacerations on her extremities, and a tear in the skin of
25   her scalp. O'Hara testified that it was possible the wounds on her arms and
     hands were defensive, or "fighting back" wounds.
26
          Crime scene investigators found large quantities of blood and large
27   bloodstains in the living room and kitchen area near the bodies. A substantial
     amount of blood had collected under Cathy's body. Another pool of blood was
28   found near Cathy's body on the floor between the kitchen and the living room.

1    On the wall just south of Michael's body, investigators found a large bloodstain
     two to three feet high. An investigator testified that, given the quantity of blood
2    and the height of the stain, it was consistent with Cathy's body being up against
     the wall while she was crawling or rolling, but not on her feet. A similar stain
3    at the same approximate height was found on a closet door by the entryway,
     several feet west of Michael's body. An investigator testified that this stain was
4    also consistent with Cathy's body being pushed or rubbing up against the area.
     Another significant blood stain was found on a wooden plant stand adjacent to
5    the large wall stain and Michael's body. A smaller bloodstain was found on the
     doorknob to the front door and the area around the doorknob adjacent to the
6    entryway closet.

7           Investigators found numerous smaller bloodstains throughout the
     apartment. Some of these bloodstains contained DNA matching defendant's
8    DNA. A police officer testified that it is common for an attacker with a knife to
     cut himself, particularly when the knife has no guard on the handle.
9    Bloodstains containing defendant's DNA were found as follows:

10   Cathy was wearing nylon stockings at the time of her death. The stockings
     contained multiple bloodstains. Crime lab analysts found defendant's DNA in
11   at least one of the stains.

12   Investigators found blood droplets containing defendant's DNA on the wheel of
     a child's bicycle in the living room.
13
     Defendant was a major donor of the DNA found in a bloodswipe on the edge of
14   a hallway closet door.

15   Defendant was the single source of blood swiped on a doorknob on the exterior
     side of the master bedroom door.
16
     Investigators swabbed a bloodstain on the area around the hallway bathroom
17   sink. Defendant was a major contributor to the DNA, and Cathy was a minor
     contributor.
18
     Investigators found a bloodstain on a towel next to the hallway bathroom sink.
19   Defendant was a major contributor to the DNA in the stain, and Cathy was a
     minor contributor.
20
     Investigators found a transfer bloodstain on a teddy bear. [FN3.] Cathy was the
21   major contributor to the DNA in the stain, and defendant was a potential minor
     contributor.
22
            FN3. Investigators found at least two teddy bears in the apartment.
23          They found one on a shelf in the living room. They found another in a
            box in a child's bedroom. Photos show that both contained bloodstains.
24          The record is ambiguous as to which was the source of the DNA test.

25   Defendant was the single source of a diluted bloodstain on a dust ruffle on the
     bed in the master bedroom.
26
     Additionally, investigators found a broken fingernail on the floor a few feet
27   from Michael's body. Cathy was the major contributor to the DNA on the
     fingernail, and defendant was a potential minor contributor.
28

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
P:\PRO-SE\LHK\HC.14\Do549denhc.wpd          5

1          Investigators used luminol, a chemical that glows on contact with blood,
   to detect trace amounts of blood not visible to the human eye. In addition to
2   blood on the floor of the living room and kitchen area, the luminol revealed
   blood (1) on the carpet of the master bedroom; (2) in the middle bedroom, in a
3   pattern leading from the door to a box in a corner where one of the teddy bears
   was found; (3) on the floor of the hallway bathroom; and (4) on the floor of the
4   hallway leading from the living rooms to the bedrooms. The record contains no
   evidence of any tests to determine whose blood was found in any of these
5   locations. One investigator testified that the blood in the hallway could have
   been tracked by the investigators, or by the initial police officers on the scene.
6   [FN4.]

7              FN4. The initial police officer on the scene testified that he entered the
           apartment through the northwest bedroom and walked down the hall
8           towards the living room. After exiting the apartment, he and another
           officer re-entered the apartment to check for persons in each bedroom.
9           At the preliminary hearing, Khanh Le, whom Cathy had been dating the
           year before her death, testified that he walked down the hallway and into
10          the hallway bathroom after discovering the bodies in the living room.

11          Investigators found a multitude of knives in the kitchen. A knife block
   on the kitchen counter held ten knives with matching black handles. Two slots
12   in the block were missing knives; one slot appeared to be designed for a smaller
   knife, and the other slot for a larger knife. The smaller black-handled knife was
13   found in a kitchen drawer with other knives. The larger black-handled knife
   had been placed in a dish-drying rack next to the kitchen sink. A larger
14   white-handled knife lay on the edge of the sink next to the dish-drying rack.
   The record contains no evidence of forensic tests on any of the knives.

15
          In the master bedroom, investigators found a number of Cathy's
16   personal effects lying on the bed, including photographs, insurance papers, and
   letters. An investigator testified that it appeared someone had ransacked the
17   room and pulled the items out of drawers. The investigator opined that the
   killer was looking for evidence that would connect him to the crime,
18   particularly since the killer ignored a number of valuable items in plain view.

19          In the kitchen, investigators found food in various stages of preparation,
   including a bowl of snails, a bowl of cut-up vegetables, a bowl of noodles, and a
20   pot with some cooked meat. On the dining room table next to the kitchen,
   investigators found a placemat with a partially-eaten piece of pizza, a cup with
21   orange juice, and a piece of a candy bar on a paper towel. On the kitchen
   counter, next to the white-handled knife by the sink, investigators found an
22   empty drinking glass. A fingerprint from the glass matched defendant's
   fingerprint.

23
*Do*, 2013 WL 2263986, at *1-*5.
24
                                **STANDARD OF REVIEW**
25
       This court may entertain a petition for writ of habeas corpus "in behalf of a person in
26
custody pursuant to the judgment of a State court only on the ground that he is in custody in
27
violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The
28

1 petition may not be granted with respect to any claim that was adjudicated on the merits in state
2 court unless the state court's adjudication of the claim: "(1) resulted in a decision that was
3 contrary to, or involved an unreasonable application of, clearly established Federal law, as
4 determined by the Supreme Court of the United States; or (2) resulted in a decision that was
5 based on an unreasonable determination of the facts in light of the evidence presented in the
6 State court proceeding." 28 U.S.C. § 2254(d).

7        "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state
8 court arrives at a conclusion opposite to that reached by [the U.S. Supreme] Court on a question
9 of law or if the state court decides a case differently than [the] Court has on a set of materially
10 indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). "Under the
11 'reasonable application clause,' a federal habeas court may grant the writ if the state court
12 identifies the correct governing legal principle from [the] Court's decisions but unreasonably
13 applies that principle to the facts of the prisoner's case." *Id.* at 413.

14        "[A] federal habeas court may not issue the writ simply because the court concludes in its
15 independent judgment that the relevant state-court decision applied clearly established federal
16 law erroneously or incorrectly. Rather, the application must also be unreasonable." *Id.* at 411.
17 A federal habeas court making the "unreasonable application" inquiry should ask whether the
18 state court's application of clearly established federal law was "objectively unreasonable." *Id.* at
19 409.

20        The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is
21 in the holdings (as opposed to the dicta) of the U.S. Supreme Court as of the time of the state
22 court decision. *Id.* at 412. Clearly established federal law is defined as "the governing legal
23 principle or principles set forth by the [United States] Supreme Court." *Lockyer v. Andrade*, 538
24 U.S. 63, 71-72 (2003).

25                                    **DISCUSSION**

26        Petitioner raises two claims in his federal habeas petition. First, petitioner alleges that
27 there was insufficient evidence for the jury to find that the murder of Cathy Nguyen was
28 premeditated or deliberate. Second, petitioner alleges that admission of his prior domestic

1 violence convictions violated his right to due process. The court addresses each claim in turn.

2 A.    Insufficient Evidence

3         The Due Process Clause "protects the accused against conviction except upon proof
4 beyond a reasonable doubt of every fact necessary to constitute the crime with which he is
5 charged." *In re Winship*, 397 U.S. 358, 364 (1970). A federal court reviewing collaterally a
6 state court conviction does not determine whether it is satisfied that the evidence established
7 guilt beyond a reasonable doubt. *See Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992); *see, e.g.,*
8 *Coleman v. Johnson*, 132 S. Ct. 2060, 2065 (2012) (per curiam) ("the only question under
9 *Jackson* [*v. Virginia*, 443 U.S. 307 (1979)], is whether [the jury's finding of guilt] was so
10 insupportable as to fall below the threshold of bare rationality"). The federal court "determines
11 only whether, 'after viewing the evidence in the light most favorable to the prosecution, any
12 rational trier of fact could have found the essential elements of the crime beyond a reasonable
13 doubt.'" *Payne*, 982 F.2d at 338 (quoting *Jackson*, 443 U.S. at 319). Only if no rational trier of
14 fact could have found proof of guilt beyond a reasonable doubt, has there been a due process
15 violation. *Jackson*, 443 U.S. at 324. To grant relief, under the AEDPA, a federal habeas court
16 must conclude that "the state court's determination that a rational jury could have found that
17 there was sufficient evidence of guilt, i.e., that each required element was proven beyond a
18 reasonable doubt, was objectively unreasonable." *Boyer v. Belleque*, 659 F.3d 957, 964-65 (9th
19 Cir. 2011).

20         The California Court of Appeal rejected petitioner's claim.

21         "A verdict of deliberate and premeditated first degree murder requires
more than a showing of intent to kill. [Citation.] 'Deliberation' refers to
22         careful weighing of considerations in forming a course of action;
'premeditation' means thought over in advance. [Citations.] 'The process of
23         premeditation does not require any extended period of time. "The true test is
not the duration of time as much as it is the extent of the reflection. Thoughts
24         may follow each other with great rapidity and cold, calculated judgment may be
arrived at quickly. . . ." [Citations.]'" (*People v. Koontz* (2002) 27 Cal.4th
25         1041, 1080.) "An intentional killing is premeditated and deliberate if it
occurred as the result of preexisting thought and reflection rather than
26         unconsidered or rash impulse." (*People v. Stitely* (2005) 35 Cal.4th 514, 543.)

27         Defendant contends the evidence is insufficient to support a finding of
deliberation and premeditation under *People v. Anderson* (1968) 70 Cal.2d 15.
28         Anderson had been living with a woman for about eight months when he

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
P:\PRO-SE\LHK\HC.14\Do549denhc.wpd          8

brutally stabbed her 10-year-old daughter to death. (*Id.* at p. 19.) He inflicted more than 60 stab wounds over the girl's entire body, including a post-mortem wound from her rectum to her vagina. (*Id.* at pp. 21-22.) Her dress had been torn off, and the crotch of her panties had been ripped out. (*Id.* at p. 21.) The prosecution contended the murder was sexually motivated. (*Id.* at p. 22.) Our high court, however, found insufficient evidence to support first degree murder. It reduced Anderson's sentence to second degree murder, notwithstanding the heinous nature of the crime. (*Id.* at p. 23.) It held that "the brutality of a killing cannot in itself support a finding that the killer acted with premeditation and deliberation." (*Id.* at pp. 23-24.)

The *Anderson* court identified three categories of evidence courts have used to assess deliberation and premeditation: (1) "planning activity," or facts about how and what the defendant did before the killing that show the defendant was engaged in activity directed toward, and intended to result in, the killing; (2) facts about the defendant's prior relationship to or conduct with the victim from which the jury could reasonably infer a "motive" to kill; and (3) "manner of killing," or facts showing that the manner of killing was so particular and exacting that the defendant acted according to a "preconceived design." (*People v. Anderson, supra*, 70 Cal.2d at pp. 26-27.) (Hereafter, "the *Anderson* factors.") The court further observed that courts typically sustain first degree murder verdicts when there is evidence of all three factors, or at least extremely strong evidence of type (1), or evidence of type (2) in conjunction with type (1) or type (3). (*Id.* p. at 27.)

The court held that the evidence of Anderson's conduct was insufficient to show any of these three factors. (*People v. Anderson, supra*, 70 Cal.2d at p. 27.) In assessing the evidence of type (1), "planning" evidence, the court contrasted the facts with those in *People v. Hillery* (1965) 62 Cal.2d 692, in which the court found the evidence was sufficient to support first degree murder. In *Hillery*, the killer surreptitiously entered the victim's home, took measures to silence the victim, and carried her to a location where they were unlikely to be discovered. (*Id.* at p. 704.) By contrast, Anderson had taken none of these steps, and the court found no evidence of a relationship between Anderson and the victim from which the jury could infer a motive. (*People v. Anderson, supra*, 70 Cal.2d at p. 33.) Regarding the manner of killing, the defendant in *Hillery* had stabbed his victim directly in her chest. (*People v. Hillery, supra*, 62 Cal.2d at 704.) The *Anderson* court noted that this evidenced a deliberate intention to kill, as compared with the "'indiscriminate' multiple attack of both superficial and severe wounds" that Anderson inflicted. (*People v. Anderson, supra*, 70 Cal.2d at pp. 26-27.) The court found the manner of killing in *Anderson* more like that in *People v. Craig* (1957) 49 Cal.2d 313, in which the manner of death, although violent and brutal, could not support an inference that the wounds were inflicted "deliberately and in a particular manner." (*People v. Anderson, supra*, 70 Cal.2d at p. 33.)

More recently, the California Supreme Court has clarified the application of the *Anderson* factors. It noted that "[t]he *Anderson* guidelines are descriptive, not normative. [¶] The *Anderson* factors, while helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive." (*People v. Perez* (1992) 2 Cal.4th 1117, 1125.) "Unreflective reliance on *Anderson* for a definition of premeditation is inappropriate. The *Anderson* analysis was intended as a framework to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations.

It did not refashion the elements of first degree murder or alter the substantive law of murder in any way." (*People v. Thomas* (1992) 2 Cal.4th 489, 517.) In *People v. Perez*, *supra*, 2 Cal.4th 1117, the court found the evidence sufficient to support a verdict of first degree murder on facts similar to those here. (*Id.* at p. 1125.) Perez had known the victim since high school. (*Id.* at p. 1122.) He stabbed her to death in her home shortly after her husband left for work. (*Id.* at p. 1120.) The front door of the home was found ajar, and a broken dish with dog food was found near the victim's body. (*Id.* at p. 1121.) Evidence of a violent struggle was found throughout the home. (*Id.* at pp. 1121-1122.) The victim's body suffered 26 stab wounds and 12 puncture wounds to her head, face, neck, and carotid artery. (*Id.* at p. 1122.) She also suffered defensive wounds to her forearms, wrists, and hands, in addition to blunt force injuries to her eyes, nose, and lips. (*Ibid.*) Perez used two knives; one was found lying broken near the victim's body. (*Ibid.*) He cut his hands during the attack. (*Id.* at p. 1123.) In the master bedroom, dresser drawers and jewelry boxes were found open. (*Id.* at p. 1121.)

The *Perez* court found that the jury could have inferred the following events from the evidence: Perez entered the victim's home surreptitiously while she was warming up her car. (*People v. Perez*, *supra*, 2 Cal.4th at p. 1126.) He surprised her, causing her to drop the dish containing the dog food. (*Ibid.*) He began beating her about the head and neck with his fists. (*Ibid.*) He retrieved a knife from the kitchen, which broke during the attack and cut his hands. (*Ibid.*) He then retrieved a second knife to complete the killing. (*Ibid.*)

The court found evidence of planning in Perez's surreptitious entry into the home. (*Ibid.*) Having surprised the victim, Perez then had a motive to kill her to prevent her from identifying him. (*Id.* at pp. 1126-1127.) The manner of killing, in which defendant paused to retrieve a second knife, also demonstrated premeditation and deliberation. (*Id.* p. at 1127.) The court also noted that Perez's conduct after the killing – searching through dresser drawers and jewelry boxes – appeared to be "inconsistent with a state of mind that would have produced a rash, impulsive killing." (*People v. Perez*, *supra*, 2 Cal.4th at p. 1128.)

We find that the facts of this case bear a greater resemblance to those of *Perez* than those of *Anderson*. Though the evidence of planning and motive is scant – perhaps due to the 16-year delay in identifying and arresting the defendant – the jury could have inferred premeditation and deliberation from the manner of killing.

First, the evidence is consistent with a violent struggle between defendant and Cathy. Respondent argues that the wounds were not inflicted in rapid succession because defendant pursued Cathy through the apartment as she physically struggled and fought for her life. Although the record does not support the inference that defendant pursued Cathy throughout the apartment, the bloodstains on the south wall suggest that she may have been trapped or pushed up against that wall. Together with the bloodstain on the entryway closet door, the wounds on Cathy's extremities, and the broken fingernail found near her body, the jury could have inferred that Cathy had engaged in a prolonged attempt to defend herself and Michael. The bloodstains around the entryway area, together with the blood on the front door doorknob, are consistent with an attempt by Cathy to escape from defendant. Under either scenario, some period of time must have elapsed between the start of the attack and Cathy's loss of volition. The jury could reasonably infer that the passage of

1  time, combined with resistance from the victim, required defendant to exhibit a
   sufficient degree of deliberation and intent to kill to convict defendant of first
2  degree murder.

3          The sheer number of wounds on Cathy's body – some of which were
   likely fatal by themselves – is further evidence of defendant's intent to kill.
4  (*People v. Elliot* (2005) 37 Cal.4th 453, 471 [three potentially lethal knife
   wounds, together with numerous other stab and slash wounds, implied a
5  preconceived design to kill]; *People v. San Nicolas* (2004) 34 Cal.4th 614, 658-
   659 [sheer number of wounds supported a finding of deliberation].)

6
          Respondent argues that defendant "chose not to relent until he delivered
7  the lethal blows to Cathy's chest and neck." The record does not support this
   claim; there is no evidence of the order in which defendant inflicted the wounds.
8  Nonetheless, defendant inflicted a majority of the stab wounds to Cathy's upper
   torso. In particular, defendant stabbed Cathy in the neck seven times, and he
9  stabbed her once in the left breast directly in front of the heart. It is common
   knowledge that the neck contains life-critical blood vessels, such as the carotid
10 arteries and jugular veins, both of which defendant severed. The jury may have
   inferred that defendant was aiming the knife at her neck and heart with the
11 deliberate intent to kill her by severing critical blood vessels or stabbing her
   heart. This evidence supports a finding of deliberation.

12
          Finally, evidence of motive is not altogether absent. As in *Perez*,
13 defendant had known the victim prior to the crime. The jury could have
   inferred that defendant killed Cathy to prevent her from identifying him after
14 initially assaulting her or Michael. The jury could also have inferred that
   defendant killed Cathy to gain access to her personal effects, found in the
15 ransacked master bedroom. Alternatively, as an investigator opined in his
   testimony, the jury could have found that defendant was searching for any
16 documents that may have connected him to the victims. In either scenario, the
   papers and photographs on Cathy's bed, together with the absence of any blood
17 on these items, suggest defendant conducted himself carefully and with purpose
   such that his post-killing conduct was inconsistent with a state of mind that
18 would have produced a rash, impulsive killing. (*People v. Perez, supra,* 2
   Cal.4th at p. 1128.)

19
          Given the totality of the record, a rational jury could have found beyond
20 a reasonable doubt that the defendant murdered Cathy with deliberation and
   premeditation.

21
*Do*, 2013 WL 2263986, at *5-*8.
22
          Petitioner's argument that the evidence required to establish premeditation and
23
deliberation was insufficient under state law was rejected by the California state courts. To the
24
extent petitioner argues that the California Court of Appeal was incorrect in its analysis and
25
interpretation of state law, he is not entitled to habeas relief. The *Jackson* standard must be
26
applied with explicit reference to the substantive elements of the criminal offense as defined by
27
state law. *Jackson*, 443 U.S. at 324 n.16; *see, e.g., Boyer*, 659 F.3d at 968 (concluding it was not
28

1 unreasonable, in light of Oregon case law, for Oregon court to conclude that a rational jury could
2 find beyond a reasonable doubt that petitioner intended to kill his victim based on proof that he
3 anally penetrated several victims with knowledge that he could infect them with AIDS). The
4 California Court of Appeal's ruling on the state law issue is binding on this court.

5 However, "the minimum amount of evidence that the Due Process Clause requires to
6 prove the offense is purely a matter of federal law." *Coleman*, 132 S. Ct. at 2064. Here,
7 petitioner has not shown that the California Court of Appeal was objectively unreasonable in
8 finding sufficient evidence to support the elements of premeditation and deliberation in light of
9 the state law, and the high bar for the *Jackson* claim.

10 Petitioner argues that applying the *Anderson* factors does not establish premeditation and
11 deliberation. The argument has some weight because the only witnesses who could provide a
12 motive were petitioner's victims, and there was no non-circumstantial evidence of planning.
13 However, California courts have made it clear that the *Anderson* factors are to be used only for
14 guidance, and do not provide concrete prerequisites for proving premeditation and deliberation
15 in each and every case, nor are they required to be present in some special combination or
16 accorded a particular weight. *See Mayfield*, 14 Cal.4th at 767.

17 Based on the evidence presented at trial, a rational trier of fact could have concluded that
18 petitioner premeditated and deliberated Cathy's murder. The evidence of numerous bloodstains
19 throughout the apartment, and especially on the walls and closet door, was consistent with
20 Cathy's body being pushed or rubbing up against those areas. From that, as well as Cathy's
21 possible defense wounds, the jury could reasonably infer that Cathy was trying to defend herself
22 from petitioner, and that she was trying to escape from petitioner. *See, e.g.*, *Perez*, 2 Cal.4th at
23 1127-28 (recognizing that evidence led to the inference that some period of time elapsed
24 between first set and second set of knife wounds, and that time elapse, in conjunction with the
25 number of wounds inflicted as well as the manner of killing, could have led the jury to infer
26 premeditation and deliberation). The jury could have inferred that while Cathy was trying to
27 escape or defend herself, petitioner reflected on the decision to kill her. Thus, the killing was not
28 the result of "mere unconsidered or rash impulse." *People v. Elliot*, 37 Cal.4th 453, 471 (2005).

1  In addition, Cathy had 22 stab wounds and 13 incised wounds on her body. Although not all of
2  the stab wounds were immediately lethal, "both of her carotid arteries and jugular veins had been
3  severed, and her lungs had been punctured." *Do*, 2013 WL 2263986, at \*3. A reasonable jury
4  could infer that the number of wounds, including multiple lethal ones, suggested a preconceived
5  design to kill. *See, e.g., Elliot*, 37 Cal.4th at 471. Finally, that Cathy's bedroom was ransacked
6  could lead a reasonable jury to infer that petitioner went through Cathy's personal effects
7  without leaving a trace of blood on any of the items. As the California Court of Appeal
8  observed, that evidence could suggest that petitioner "conducted himself carefully and with
9  purpose such that his post-killing conduct was inconsistent with a state of mind that would have
10  produced a rash, impulsive killing." *Do*, 2013 WL 2263986, at \*8. Thus, the evidence was
11  sufficient to support a verdict of premeditated and deliberate first-degree murder.

12       For the above reasons, the California Court of Appeal decision was not an unreasonable
13  application of *Jackson*, and petitioner is not entitled to federal habeas relief on this claim.

14  B.    Admission of prior convictions

15       Petitioner claims that his right to due process was violated when the trial court admitted
16  evidence of petitioner's two prior misdemeanor domestic violence convictions in 1993 and 2000,
17  for the purpose of impeachment. Petitioner argues that the admission of these prior convictions
18  should have been excluded as propensity evidence, and as overly prejudicial.

19       The California Court of Appeal rejected petitioner's claim under state and federal law. It
20  concluded that the trial court did not violate petitioner's federal due process rights because the
21  prior convictions were explicitly not admitted to show propensity or character, but merely for the
22  limited scope of impeachment. *Do*, 2013 WL 2263986, at \*11.

23       The admission of evidence is not subject to federal habeas review unless a specific
24  constitutional guarantee is violated or the error is of such magnitude that the result is a denial of
25  the fundamentally fair trial guaranteed by due process. *See Henry v. Kernan*, 197 F.3d 1021,
26  1031 (9th Cir. 1999). The U.S. Supreme Court "has not yet made a clear ruling that admission
27  of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to
28  warrant issuance of the writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009). In

1  fact, the U.S. Supreme Court has expressly left open the question of whether admission of
2  propensity evidence violates due process. *Estelle v. McGuire*, 502 U.S. 62, 75 n.5 (1991).
3  Based on the U.S. Supreme Court's reservation of this issue as an "open question," the Ninth
4  Circuit has held that a petitioner's due process right concerning the admission of propensity
5  evidence is not clearly established, as required by AEDPA. *See Alberni v. McDaniel*, 458 F.3d
6  860, 866-67 (9th Cir. 2006); *accord Mejia v. Garcia*, 534 F.3d 1036, 1046 (9th Cir. 2008)
7  (reaffirming *Alberni*, and stating that there is "no Supreme Court precedent establishing that
8  admission of propensity evidence, as here, to lend credibility to a sex victim's allegations, and
9  thus indisputably relevant to the crimes charged, is unconstitutional."). As federal courts may
10  grant habeas relief only if a state court decision is contrary to, or an unreasonable application of
11  clearly established federal law as determined by the U.S. Supreme Court, *see* 28 U.S.C. §
12  2254(d)(1), there can be no federal habeas relief on this claim because there is no clearly
13  established federal law. Therefore, the California Court of Appeal's rejection of such a claim
14  cannot be grounds for federal habeas relief. *Larson v. Palmateer*, 515 F.3d 1057, 1066 (9th Cir.
15  2008).

16       Alternatively, even assuming there was a clearly established law that a petitioner had a
17  due process right regarding the admission of propensity evidence, the due process inquiry in
18  federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it
19  rendered the trial fundamentally unfair. *See Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir.
20  1995). Only if there are no permissible inferences that the jury may draw from the evidence can
21  its admission violate due process. *See Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir.
22  1991). Here, both petitioner and his ex-wife denied that petitioner had struck her in both 1993
23  and 2000. Petitioner's misdemeanor convictions were used to impeach both petitioner and his
24  ex-wife. The admission of these convictions for impeachment purposes, rather than to show
25  conduct in conformity therewith, was not so inflammatory or emotionally charged so as to
26  violate due process. *See id.* at 920-21.

27       In sum, because the United States Supreme Court has expressly left open the question
28  presented in the petition, the California Court of Appeal's rejection of petitioner's claim that the

1  trial court's admission of his prior two misdemeanor convictions violated his due process rights

2  was not contrary to, or an unreasonable application of, clearly established U.S. Supreme Court

3  law. Accordingly, the state court's decision was not contrary to, or an unreasonable application

4  of, clearly established U.S. Supreme Court law.

5                                    **CONCLUSION**

6        The petition for writ of habeas corpus is DENIED.

7        The federal rules governing habeas cases brought by state prisoners require a district

8  court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in its

9  ruling. *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254. Petitioner has

10 not shown "that jurists of reason would find it debatable whether the petition states a valid claim

11 of the denial of a constitutional right." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

12 Accordingly, a COA is DENIED.

13       The clerk is instructed to enter judgment in favor of respondent, terminate all pending

14 motions, and close the file.

15       IT IS SO ORDERED.

16 DATED:  12/14/2015

17                                              _____
                                                LUCY H. KOH
                                                United States District Judge

18

19

20

21

22

23

24

25

26

27

28